## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JOHN RAYMOND MULLEN | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 3:05-CV-2282-AH |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the written consent of the parties to proceed before a United States Magistrate Judge and the District Court's Transfer Order filed on March 22, 2006, in accordance with the provisions of 28 U.S.C. § 636(b), came on to be considered Plaintiff John Mullen's action brought under 42 U.S.C. § 405(g) seeking judicial review of Defendant's denial of Plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1382.

Procedural History: On June 19, 2003, Plaintiff filed an application for Social Security disability insurance benefits and Supplemental Security Income ("SSI") payments alleging disability due to depression. (Administrative Record 57-59, 64, 225-28 [Hereinafter Tr.].)

The Administrative Law Judge ("ALJ") conducted a hearing on September 15, 2004. (Tr. 250-88.) On November 24, 2004, the ALJ denied Plaintiff's request for disability insurance benefits and SSI payments, finding that he was not disabled because he retained the residual functional capacity ("RFC") to perform unskilled sedentary through heavy work with limited public contact. (Tr. 20-21.) Plaintiff timely requested a review of the ALJ's decision by the

Appeals Council, and on November 9, 2005, the Appeals Council denied the request. (Tr. 4-6.) Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

Plaintiff filed his federal complaint on November 21, 2005. Defendant filed her answer on January 26, 2006. Both parties filed their briefs on March 17, 2006.[1]

Standard of Review–Social Security Claims: When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of whether: (1) the ALJ's decision is supported by substantial evidence and (2) the proper legal standard was applied. *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)).[2] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment. *Id.* at 1022 (quoting *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988)). Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S.

---

[1] Plaintiff's Certificate of Service indicates that she mailed a copy of her brief to opposing counsel on February 6, 2006.

[2] "The scope of judicial review of a decision under the Supplemental Security Income Program is identical to that of a decision under the Social Security Disability Program." *Harrell v. Bowen*, 862 F.2d 471, 475 n.4 (5th Cir. 1988) (citing *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985)). Likewise, the relevant laws and regulations governing both types of claims are identical. *Davis*, 759 F.2d at 435 n.1.

389, 390, 91 S. Ct. 1420, 1422 (1971)).

Discussion:

To prevail on a claim for disability insurance benefits or SSI payments, a claimant bears the burden of establishing that he or she is disabled, which is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505. Substantial gainful activity is defined as "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit." § 404.1510. Where a claimant applies for benefits, the claimant must prove the existence of a disabling impairment between the claimant's alleged onset date and the date last insured. *See Moss v. Apfel*, No. 98-20215, 1999 WL 130146, at *1 (5th Cir. Feb. 12, 1999) (citing § 404.320(b)(2)).

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* § 404.1520. Under the first four steps, a claimant has the burden of proving that his disability prevents him from performing his past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity that the claimant can perform. *See*, *e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

In this case, the ALJ proceeded to step five and determined that Mr. Mullen retained the capacity to perform unskilled sedentary through heavy work with limited public contact and that jobs with these criteria are available in significant numbers in the national economy. (Tr. 20-21.) He therefore denied Plaintiff's request for disability insurance benefits and SSI payments.

(Tr. 20-21.)

**Testimony at the Administrative Hearing**

Plaintiff testified on his own behalf at the administrative hearing held on September 15, 2004. (Tr. 258-68.) He reported living with his mother and getting along fairly well with her. (Tr. 266.) He stated that he previously had worked as a taxi driver, bellman, and a computer operator, and had completed five hours of college credits and some Cisco training. (Tr. 260.) During his last period of employment, where he worked as a computer operator, he reported that his supervisors were not happy with him because he was late, missed work without a good excuse, and took breaks that were too long. (Tr. 265.) After being laid off from this job in 2001, he testified that his pre-existing depression increased in severity. (Tr. 264.) He attempted to take several college courses, but was often absent and had trouble comprehending and remembering the work. (Tr. 265-66.) He also acknowledged that he sought work after his alleged onset of disability, but his job search was unsuccessful.[3] (Tr. 259.) In response to questioning by the ALJ, Mr. Mullen acknowledged using amphetamines and marijuana, but claimed to have stopped all illegal drug use by September of 2003. (Tr. 261-63.) He also testified that he regularly visited county clinics for mental health treatment and took Prozac, Buspar and lithium for his depression and Zyprexa for sleeping problems. (Tr. 262-64.) Asked whether he thought he could engage in substantial gainful activity on a sustained basis, Plaintiff noted that he becomes frustrated easily, has difficulty retaining information and tends to isolate himself from other people. (Tr. 267.) Regarding his tendency to isolate, he explained that he suffers bouts of depression every two to three days, during which he would rather be by himself

---

[3] At the administrative hearing, Plaintiff's attorney amended the alleged onset date of disability to January 1, 2003. (Tr. 253.)

for one to three days.  (Tr.  283-84.)

Dr.  Charles Murphy, M.D., testified briefly at the hearing regarding Plaintiff's physical impairments and stated that his obesity did not result in work-related physical restrictions.  (Tr. 268-69.)  Dr.  Alvin Smith, Ph.D., a clinical psychologist, testified as the second medical expert ("ME") at the administrative hearing.  (Tr.  270-82.)  He opined that the medical evidence did not establish that Plaintiff's mental impairment met or medically equaled a listing but that he had a severe impairment of major depressive disorder, severe, recurrent, with anxiety features.  (Tr. 271-72.)  He also noted that Plaintiff's depression was not completely controlled by medication. (Tr. 271.)  Dr.  Smith testified at length regarding the Mental Residual Functional Capacity Assessment and Psychiatric Review Technique form completed by Dr.  Charles Lankford on October 7, 2003, based on Plaintiff's medical records.  (Tr. 272-73; *see also* 116-32A).  He opined that Plaintiff had moderate restrictions in activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace and had suffered no extended episodes of decompensation.  (Tr. 272-73.)  He also testified that Plaintiff's mental impairment did not have more than a minimal impact on his ability to understand, remember and carry out simple instructions, use his judgment, respond to supervisors and co-workers in a work setting and to deal with changes in the work setting.  (Tr.  273.)  In response to questioning by the ALJ, he opined that Plaintiff could engage in unskilled work activity on a continued basis with limited social contact.  (Tr.  273-74.)

In response to questioning by Plaintiff's attorney, Dr.  Smith noted that Plaintiff isolated himself from family and friends, but was unwilling to conclude that this personality feature would affect Mr.  Mullen's ability to obtain employment.  (Tr.  274.)  When asked by Plaintiff's

5

attorney to summarize the evidence in the record regarding Plaintiff's ability to adapt to change, he noted that "Dr. Hollinger"[4] opined that Plaintiff's ability to relate to others and sustain work was "fair but not great,"(Tr. 98-99), and that Dr. Gail D. Lambeth, Ph.D., came to a similar conclusion regarding his work adjustment capacity, (Tr. 274-76; *see also* 133-43). Dr. Smith also testified that several health professionals had noted that Plaintiff had expressed a desire to return to work, and that he interpreted these comments to indicate that they believed Plaintiff had "some" work capacity. (Tr. 276-77.) Asked to describe the difference been a diagnosis of "moderate" functional limitations and "severe" limitations, he explained that a person with severe functional limitations, as evidenced by a GAF score between 40 and 50, would likely not be able to handle complex tasks in the workplace, while a person with moderate limitations might be able to handle such tasks intermittently. (Tr. 279-80.) Asked specifically about Dr. Lambeth's diagnosis that Plaintiff suffered from hypomanic episodes, Dr. Smith noted that Dr. Lambeth's diagnosis of bipolar disorder was provisional, that she saw Plaintiff only once, and that symptoms of hypomania were not noted in her mental status examination of Plaintiff. (Tr. 277-78.)

Jerry Hildre testified as the vocational expert ("VE"). (Tr. 284-88.) He stated that Plaintiff's past relevant work as a bellhop would be considered heavy and unskilled, while his work as a computer operator is classified as light and skilled. (Tr. 285.) When asked to assume that Plaintiff was limited to performing unskilled work with limited public contact, Mr. Hildre opined that he would not be able to return to his past relevant work but could perform the jobs of janitor, dishwasher and laundry worker. (Tr. 286-87.) Plaintiff's attorney asked Mr. Hildre to

---

[4] There appears to be an error in the transcript. The document to which the ME was referring, Exhibit 2F, (Tr. 98-99), was signed by Joel Holiner, M.D.

6

consider how a person's ability to do the aforementioned jobs would be affected if the person had difficulty completing tasks and projects, was absent at least three days per month from work, and had the characteristics listed by the ALJ, and Mr. Hildre opined that such a person would not be able to do any work on a sustained basis. (Tr. 287-88.)

**The ALJ Did Not Reject the Opinions of Plaintiff's Treating Physicians**

The sole point of error raised in Plaintiff's brief is that the ALJ failed to apply the appropriate legal standards in his RFC determination in accepting and relying on the opinion expressed by Dr. Smith at the administrative hearing, which he claims is inconsistent with the report of his therapist, Dr. Barbara Michaels, Ed. D., and with the assessment of the consultative examiner, Dr. Lambeth. *See* § 404.1527(d). Under the regulations, the medical opinion of an examining source is generally given more weight than the opinion of a non-examining source. § 404.1527(d)(1). Where the examining source is a "treating source," any opinion regarding the nature and severity of a claimant's impairment should be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, but an ALJ may decline to give the opinion controlling weight when it is contradicted by competing first-hand medical evidence.[5]  § 404.1527(d)(2); s*ee also Walker v. Barnhart*, 158 Fed. Appx. 534, 535, 2005 WL 3340251, at *1 (5th Cir. 2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). Moreover, while an ALJ is generally required to set forth his rationale for declining to give controlling weight to a treating physician's opinion, *see* §

---

[5] To the extent that Plaintiff argues that the ALJ should have given controlling weight to Dr. Michaels's ultimate conclusion that Plaintiff is unable to work, this argument is wholly without merit, as the determination that a claimant is unable to work is a legal conclusion reserved exclusively to the Commissioner. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *see also* § 404.1527(e)(1).

404.1527(d), the ALJ need not consider each of the factors set out in § 404.1527(d) where the record contains a contradictory opinion from another treating physician.  *Walker*, 158 Fed. Appx. at 535, 2005 WL 3340251, at *1.

Dr. Michaels, a licensed marriage and family therapist, saw Plaintiff a total of twelve times beginning on January 29, 2003.  (Tr.  103.)  In an undated summary completed at the end of Plaintiff's treatment, Dr.  Michaels noted that Plaintiff was severely depressed and had great difficulty concentrating and completing tasks.[6]  (Tr.  103.)  She also noted that Mr.  Mullen complained of an inability to focus, severe insomnia, feelings of apathy, and forgetfulness.  (Tr.  103.)  He denied active suicidal ideations.  (Tr.  103.)  Her multiaxial assessment[7] was: (Axis 1) major depressive disorder, recurrent, severe; (Axis 2) none; (Axis 3) obesity, hypertension, sleep disorder; (Axis 4) severe financial problems, inability to work, impaired social skills related to long term drug use; (Axis 5) GAF score of 60.[8]  (Tr.  103.)  She opined that Plaintiff was unable to obtain employment due to his depression which caused him to have an impaired memory, impaired concentration, poor social skills, and an impaired ability to adapt to changes.  (Tr.  104.)  In an undated addendum, she reiterated her opinion that Plaintiff was "in need of social security disability."  (Tr.  104.)

---

[6] The administrative record contains no progress notes or summaries of Dr.  Michaels's therapy sessions with Mr.  Mullen.

[7] According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV TR") published by the American Psychiatric Association, "a multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome."  DSM-IV TR 27 (4th ed.  text rev. 2000).  The five axes are: (I) clinical disorders, (II) personality disorders, (III) general medical conditions, (IV) psychosocial and environmental problems and (V) global assessment of functioning.  *Id*.

[8] A GAF score between 51 and 60 indicates "moderate symptoms of moderate difficulty in social, occupational, or school functioning."  DSM-IV TR, *supra* note 5, at 34.

Mr. Mullen was evaluated by Dr. Gail Lambeth, Ph.D., at the behest of the Texas Rehabilitation Commission on June 8, 2004. (Tr. 133.) Plaintiff's chief complaints were depression, insomnia and lack of concentration. (Tr. 133.) He reported a history of depression which manifested itself through mood swings, anxiety, insomnia, a need to isolate, and attention problems and stated that he had never been able to find a combination of medication that completely resolved his symptoms. (Tr. 133.) He stated that he felt anxiety, dread, and guilt almost all of the time and that he had problems handling stress and feelings of worthlessness and helplessness. (Tr. 134-35.) After being laid of from his job at Texas Instruments in 2001, he was homeless for a period of time and actively abused illegal drugs. (Tr. 134.) He denied abusing any illegal substances at the time of the evaluation, but his recent medical records indicated that he used marijuana two to three times per week. (Tr. 134.) He stated that he didn't suffer sleeping problems as long as he took his medication, but that he nevertheless had difficulty getting up in the morning. (Tr. 134.) He reported that his insomnia, distractibility, inability to complete projects, and inability to handle stress had been increasing. (Tr. 134-35.) He reported suffering suicidal thoughts, but had no plans to act on them. (Tr. 134.) He also reported occasional racing thoughts. (Tr. 134.)

On the Wechsler Adult Intelligence Scale-III ("WAIS-III") his IQ scores were: 99 (full-scale), 99 (verbal), 98 (performance), which placed him in the average range of mental ability. (Tr. 137.) His Wide Range Achievement Test-Revised ("WRAT-R") scores were within the range expected for a person with his IQ level. (Tr. 138.) On the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), Plaintiff's clinical scale elevations were similar to patients who were described as passive independent, moderately anxious and depressed, and manifesting

9

a tendency to be self-analytical and ruminatively introspective. (Tr. 138.) Dr. Lambeth's multiaxial assessment was: (Axis 1) bipolar disorder II, provisional; (Axis 2) none; (Axis 3) deferred; (Axis 4) unemployment, financial problems, social isolation, lack of access to medical care; (Axis 5) GAF score of 45.[9] (Tr. 139.) She opined that his prognosis was fair-to-guarded with adequate treatment and intervention. (Tr. 139.) Dr. Lambeth also completed a medical source statement of ability to do work-related activities (mental) wherein she opined that Mr. Mullen's ability to understand, remember and carry out detailed instructions was moderately impaired and his ability to make judgments on simple work-related decisions was mildly impaired. (Tr. 140.) She determined that he was not impaired in his ability to carry out short, simple instructions and voiced no opinion regarding his ability to understand and remember short, simple instructions. (Tr. 140.) She also opined that he suffered slight limitations in his ability to interact appropriately with the public, supervisors and co-workers and moderate limitations in his ability to respond appropriately to work pressures and changes in a routine work setting. (Tr. 141.)

Although Mr. Mullen argues that the ALJ rejected the report of Dr. Michaels and Dr. Lambeth's assessment in accepting the opinion of the ME, Dr. Smith, the decision rendered on November 24, 2004, does not support his argument. Although Dr. Smith reviewed the medical records which include Dr. Michaels's two-page summary, neither the ALJ nor Plaintiff's counsel questioned the ME with respect to the report.

In his decision, the ALJ noted the report of Dr. Michaels, in which she *inter alia* gave

---

[9] A GAF score between 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV TR, *supra* note 5, at 34.

Plaintiff a GAF score of 60[10] which was consistent with Dr. S.A. Somodevilla's August 26, 2003, consultative physiological evaluation in which he found moderate impairment in social, occupational or school functioning and a GAF score of 55. (Tr. 17; *see also* 100-02.) Therefore, rather than rejecting Dr. Michaels's assessment, the ALJ found that her assessment agreed with that of Dr. Somodevilla's. The ALJ also discussed the consultative examination conducted by Dr. Lambeth on June 8, 2004. (Tr. 17-18.) In her report, Dr. Lambeth gave Mr. Mullen a GAF score of 45[11] which suggested more serious impairments, (Tr. 45), but elsewhere in her report noted that the results of the MMPI-2 administered to Plaintiff were "similar to patients who are described as passive independent, *moderately* anxious and depressed," (Tr. 138, emphasis added) and further noted that his prognosis was "fair to guarded with adequate treatment and intervention," (Tr. 139.) The ALJ recounted these findings as well as Dr. Lambeth's Medical Source statement, (Tr. 140-41), but did not reject any of her findings, (Tr. 17-19).

As noted above, the ME, Dr. Smith, concluded from a review of all the records a consistency between the findings of the healthcare professionals that Plaintiff retained the ability to engage in substantial work with limitations, which the ALJ found to be credible and in accordance with the medical evidence in the record.[12] (Tr. 18).

The ALJ not only determined that Mr. Mullen no longer retained the capacity to perform

---

[10] *See* note 8, *supra*.

[11] *See* note 9, *supra*.

[12] In the Psychiatric Review Technique form completed on October 7, 2003, Dr. Charles Langford opined that Plaintiff had mild limitations in activities of daily living and social functioning, and moderate limitations in maintaining concentration, persistence and pace. (Tr. 130.)

the skilled labor he previously engaged in, he also concluded that Plaintiff's ability to work was diminished by the requirement that he have limited contact with the public.  *See*, *e.g.*, *Foy v. Barnhart*, 139 Fed. Appx. 39, 44, 2005 WL 1526103, at *4-5 (10th Cir. 2005) (finding that an ALJ did not reject a medical source statement even though the ALJ's RFC determination did not include all of the specific limitations addressed in the doctor's statement).  Therefore, the ALJ applied the correct legal standards in his ultimate conclusion regarding the effect of Mr. Mullen's mental impairment on his ability to engage in substantial gainful activity which is supported by substantial evidence, and Defendant is entitled to judgment dismissing Plaintiff's complaint with prejudice.

Signed this 7th day of December, 2006.

_Wm. F. Sanderson Jr._
————————————————
Wm. F. Sanderson Jr.

United States Magistrate Judge

.